# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIEANNET STRICKLER, | : | Civil No. 1:21-CV-1380 |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **(Magistrate Judge Carlson)** |
| | : | |
| WELLSPAN HEALTH CARE | : | |
| CAMPUS CONDOMINIUM ASS'N, | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.   Introduction

This case comes before us on a motion for summary judgment filed by the defendant, Wellspan Health Care Campus Condominium Association ("Wellspan"). (Doc. 23). The plaintiff, Marieannet Strickler, filed this lawsuit against Wellspan, her former employer, alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951, *et seq.* (Doc. 1). Specifically, Strickler alleges that she was discriminated against based on her bipolar disorder and scoliosis when her supervisors harassed her, and that she was constructively discharged after she reported this harassment.

1

Yet, even as Strickler has advanced these disability discrimination and retaliation claims, when asked if she believed her supervisor's actions were motivated by Strickler's bipolar disorder, Strickler testified: "No, I don't believe she did it for that reason." (Doc. 25-3, at 89). Indeed, later during the deposition, Strickler was asked to clarify if the harassment she was describing was based on her disability, to which she replied: "No, it was not based on my disability." (Id. at 99). Similarly, when asked if she believed another supervisor harassed her because of her disability, she replied: "No." (Doc. 25-4, at 2). Thus, we are presented with a striking circumstance: a disability discrimination case where the plaintiff denies that her antagonists discriminated against her due to her disability.

Wellspan has now filed a motion for summary judgment, contending that there are no genuine factual disputes regarding the claims in this case, and thus, Wellspan is entitled to judgment as a matter of law on these claims. (Doc. 23). After consideration, we agree that Strickler's claims fail under the ADA and the PHRA. Accordingly, the defendant's motion for summary judgment will be granted.

II.   **Statement of Facts and of the Case**[1]

Marieannet Strickler began working with Wellspan in July of 1997 as a Practice Manager. She was promoted to Operations Manager for Wellspan's Women

---

[1] The factual background of this Memorandum Opinion is taken from the parties' submissions to the extent they are consistent with the evidence in the record. (Docs. 23-25, 30-31, 36, 39).

and Children Services Line in 2010. In this position, Strickler was responsible for a variety of administrative and fiscal tasks, including budgeting, finance, and management of personnel. From 2011 to 2013, Strickler reported directly to Megan Lecas, and from 2013 to April of 2018, she reported directly to Patricia McGuire.

Strickler suffers from bipolar disorder, having been diagnosed in the late 1980s. Strickler had undergone electroshock therapy for this condition, and she continues to receive treatment for this impairment. According to Strickler, she only told three people at Wellspan about her bipolar disorder—Mary Fortney, Senior Vice President of Human Resources; Dr. Karen Jones, President of Wellspan Medical Group; and Jason Elliott, who took over Fortney's position in HR upon her retirement. She also submitted paperwork when she was hired, which noted that she had manic depressive disorder that was characterized at that time as "stable." (Doc. 30-4, at 2).

Regarding McGuire's supervision of Strickler, it is undisputed that McGuire and Strickler did not necessarily get along, nor did they see eye to eye when it came to work matters. On this score, when McGuire became Strickler's supervisor, she identified a number of areas in which she wanted Strickler to improve. (Doc. 25-16). Strickler noted her disagreement with some of the comments made by McGuire. (Id.) McGuire's evaluations of Strickler in 2014 and 2015 addressed some of the same concerns as outlined in the 2013 performance improvement discussion, and once

again Strickler disagreed with McGuire's assessment. (Docs. 25-17, 25-19). Although McGuire's evaluations noted areas where Strickler could improve, McGuire also gave Strickler credit for her strengths, and Strickler received merit-based salary increases in 2014 and 2015. (See id.; Docs. 25-18, 25-20).

Strickler met with Fortney in December of 2015, and she complained that McGuire's management and treatment of her constituted harassment. It was at this meeting that Strickler informed Fortney and Dr. Jones that she suffered from bipolar disorder. However, while Strickler conceded that she did not tell Fortney and Jones that McGuire's harassment was because of her disability, she appears to assert that because she mentioned her bipolar disorder at this meeting, Fortney and Jones could have inferred that the harassment was related to her bipolar disorder. She also points to an email she wrote to Fortney, describing herself as being part of a "protected class." (Doc. 30-5). However, this email does not mention anything about Strickler's bipolar disorder. Moreover, in her deposition testimony, Strickler admitted that she never verbally told Lecas or McGuire that she suffered from bipolar disorder. She does assert, however, that McGuire made comments about her that, in her opinion, aligned with the symptoms of her bipolar disorder, such as comments regarding Strickler acting paranoid or remarking that her eyes were "blank" or "vacant."

Thus, Fortney looked into Strickler's allegations of harassment against McGuire. On this score, Strickler claims that Fortney told her that McGuire had met

some of the criteria for harassment, but not all criteria, and she offered Strickler a severance package. For its part, Wellspan asserts that Fortney concluded that McGuire's actions were appropriate management, and further, that McGuire and Strickler were likely to continue to have trouble getting along with one another, which is why Strickler was offered a severance package at that time. Ultimately, Strickler did not accept the severance package and continued working at Wellspan. She testified that she did not accept the severance package because she thought she could get a different position within the organization. She further stated that she informed Fortney and Dr. Jones of her bipolar disorder because she thought it might help in her search for a different position.

Thus, Strickler applied for several opportunities within Wellspan's organization, but she did not receive any offers that she found acceptable. Interview evaluations from June of 2017 indicate that those who evaluated her for certain positions thought that while she may have been qualified for the position, she was "too stiff/hard to talk to," "very uptight," "ha[d] a chip on her shoulder," "a little defensive," "dry," and "strict . . . doesn't smile . . . seems to look through you." (Doc. 30-9, at 2-10).

Strickler followed up with Dr. Jones in February of 2017, indicating that she had continued to report McGuire for harassment and requesting assistance. Dr. Jones informed Strickler that Jason Elliott had taken over for Fortney since her retirement,

and that she was forwarding Strickler's complaints to him. Strickler indicated to Dr. Jones that she was still "concerned about harassment as an issue." (Doc. 25-35, at 2). Elliott stated in his deposition that he was aware of the relationship between Strickler and McGuire, in that it was portrayed to him by Dr. Jones as an unhealthy and unproductive working relationship. Elliott met with Strickler in March of 2017 to discuss her concerns, and Strickler notified him in May that she was continuing to experience harassment by McGuire.

For his part, Elliott stated that he believed Strickler wanted to see McGuire fired or removed, and that he saw Strickler as the challenging dynamic in the relationship. Specifically, he noted that Strickler would complain about McGuire's tone or her actions she took as a leader, and that Strickler felt that she was being scrutinized. He further stated that while Strickler would characterize McGuire's actions as harassment, the actions McGuire was taking, in his view, "were very clearly . . . normal employee-manager interactions." (Doc. 25-11, at 32). While Strickler informed Elliott in May of 2017 that the situation with McGuire was taking a toll on her health, Elliott stated that he did not inquire further into personal matters of Strickler's health.

Elliott also met with McGuire during this time. McGuire expressed frustration with the situation because it was taking a toll on work performance, and specifically, the Women and Children Services Line, which Strickler oversaw. She informed

Elliott that Strickler did not respond well to comments or criticism of her work, and that she took such comments or criticism personally. Elliott concluded that none of the actions taken by McGuire that Strickler characterized as harassment fell under the organization's harassment policy. Ultimately, in November of 2017 and effective April 1, 2018, Strickler was reassigned to work under Adam Hawk, who took over some of McGuire's departments, including the Women and Children Services Line. Elliott stated that he believed Strickler could work under Hawk because they previously had a good working relationship. Strickler concedes that reporting to Hawk did not change any of her job duties.

Strickler received a Leadership Performance Plan in September of 2018. This evaluation included comments from Hawk that Strickler only partially met expectations when it came to "working as one," with Hawk noting that there was a strained relationship with the service line, which had been addressed on prior occasions. While Hawk rated Strickler as "Exceeding Expectations" in some areas, there were still areas of concern that were noted in her evaluation.

On September 14, 2018, Strickler was seen by Dr. Moola at Holy Spirit Hospital. Dr. Moola wrote a "To whom it may concern" note, stating that Strickler was seen by him on September 14, and that he recommended her taking time off work until September 24, 2018, "due to recent increase in her symptoms." (Doc. 30-11). Four days later, on September 18, 2018, Wellspan received a letter tendering

Strickler's resignation from Wellspan. (Doc. 30-12). In this letter, Strickler's attorney recounted Strickler's complaints of harassment, as well as issues she took with her September 2018 Leadership Performance Plan and the Employee Performance Improvement plan, which he characterized as setting Strickler up for failure, and further, as retaliation for the complaints she made against McGuire. The letter further characterized Strickler's resignation as a "constructive termination."

Notably, while the letter stated that the situation between Strickler and McGuire resulted in detriment to Strickler's "health and wellbeing," this letter made no mention of Strickler's bipolar disorder. Further, Strickler conceded in her deposition that the only people at Wellspan that she informed of her bipolar disorder were Fortney, Dr. Jones, and Elliott. (Doc. 25-3, at 73). Indeed, when asked if she told McGuire of her bipolar disorder, Strickler replied that she had not. (Id., at 84). Further, when asked if she believed McGuire's actions were motivated by Strickler's bipolar disorder, Strickler replied: "No, I don't believe she did it for that reason." (Id., at 89). Indeed, later during the deposition, Strickler was asked to clarify if the harassment she was describing was based on her disability, to which she replied: "No, it was not based on my disability." (Id. at 99). Similarly, when asked if she believed Lecas harassed her because of her disability, she replied: "No." (Doc. 25-4, at 2).

It is against this factual backdrop that Strickler filed the instant suit against Wellspan. She brings claims of discrimination, harassment, retaliation, and constructive discharge under the ADA and PHRA, focusing primarily on her bipolar disorder and the harassment she claims she was subjected to by her supervisors, Megan Lecas and Patricia McGuire. She asserts that she reported this harassment and was subsequently constructively discharged when she resigned employment with Wellspan in September of 2018.

Wellspan has filed the instant motion for summary judgment, arguing that these claims fail as a matter of law. (Doc. 23). The motion is fully briefed and is ripe for resolution. (Docs. 24-25, 30-31, 36, 39). After consideration, we find that there are no genuine disputes of material fact with respect to the plaintiff's discrimination claims. Specifically, we find that Strickler's disability discrimination and retaliation claims suffer from a significant and fatal flaw; namely, that Strickler cannot show that any discrimination, harassment, or adverse action she suffered was causally connected to or in any way based upon her disability. Strickler cannot carry her burden of proof on this critical element of her claim because she has denied under oath that she was harassed by the supervisors because of her disability, and there is no other competent evidence that would allow such an inference to be drawn against these supervisors given Strickler's denials. Accordingly, we will grant the defendant's motion for summary judgment.

## III.   <u>Discussion</u>

### A. <u>Motion for Summary Judgment – Standard of Review</u>

The defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." <u>Univac Dental Co. v. Dentsply Int'l, Inc.</u>, 702 F.Supp.2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. <u>Id.</u>, at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the

non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing

any supporting evidence of the denials." <u>Thimons v. PNC Bank, NA</u>, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." <u>Fireman's Ins. Co. of Newark New Jersey v. DuFresne</u>, 676 F.2d 965, 968 (3d Cir. 1982); <u>see</u> <u>Sunshine Books, Ltd. v. Temple University</u>, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility

determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Anderson, 477 U.S. at 252; see also Big Apple BMW, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

## B. **The Defendant's Motion for Summary Judgment will be Granted.**

As we have explained, Strickler asserts claims under the ADA and the PHRA for disability discrimination, harassment, and retaliation. She claims that she was harassed and subsequently constructively discharged because of her disabilities. However, a review of the record reveals that there is no genuine issue of material fact with respect to a critical aspect of these claims. Specifically, the record shows that McGuire and Lecas, who Strickler alleges harassed her, did not know that

Strickler suffered from bipolar disorder. Additionally, Strickler conceded that she never told Fortney, Dr. Jones, or Elliott that she believed McGuire was harassing her because of her bipolar disorder. Accordingly, we find that these claims fail as a matter of law, and as such, we will grant the defendant's motion for summary judgment.

## 1. **ADA Discrimination, Harassment, and Retaliation**[2]

The purpose of the ADA is to "prevent employment discrimination of qualified individuals on account of their disability." Koller v. Riley Riper Hollin & Colagreco, 850 F.Supp.2d 502, 512 (E.D. Pa. 2012) (citing 42 U.S.C. § 12112(a) ). The Act requires employers to make "reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability, unless the employer demonstrates that such accommodations would impose an undue hardship in the operation of their business." Id. (citations omitted).

---

[2] The plaintiff has also brought claims under the Pennsylvania Human Relations Act, which is roughly the state-law analogue to the ADA. As such, courts have noted that in general, the legal analysis applicable to a claim under the PHRA is co-extensive with that applicable under the ADA. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) ("[A]nalysis of an ADA claim applies equally to a PHRA claim."); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) ("Pennsylvania courts ... generally interpret the PHRA in accord with its federal counterparts....") Thus, we have considered the plaintiff's discrimination and retaliation claims under the ADA and the PHRA under the same analytical paradigm to avoid unnecessary redundancy.

In order to make out a *prima facie* claim for workplace discrimination under the ADA, a plaintiff must demonstrate that she is (1) disabled within the meaning of the ADA, (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, and (3) has suffered an adverse employment decision as a result of the discrimination. Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 185 (3d Cir. 2010); see also Stadtmiller v. UPMC Health Plan, Inc., 491 F. App'x 334, 336 (3d Cir. 2012); Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998). A disability can take the form of a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(1).

If the plaintiff makes a *prima facie* showing under this three-part standard, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. Id. If a legitimate, nondiscriminatory reason is given, then the plaintiff must present evidence to demonstrate that the defendant's reasons were pretext for its unlawful action. Id. The plaintiff may meet this burden by identifying evidence that allows a factfinder either to disbelieve the employer's articulated legitimate justification, or to conclude that an invidious discriminatory reason was more likely than not a "but for" cause of the employment action. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

With respect to a claim of harassment on the basis of disability, a plaintiff must allege and prove the following: (1) she was a qualified individual with a disability; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or her request for accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. Martin v. Allegheny Airlines, Inc., 126 F.Supp.2d 809, 820 (M.D. Pa. 2000) (citing Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 667 (3d Cir. 1999)).

The ADA also prohibits employers from retaliating against employees who oppose an act or practice made unlawful by the ADA or because the employee has made a charge under the ADA. 42 U.S.C. § 12203(a); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003) ("[I]t is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA"). Although requesting a reasonable accommodation does not appear to "fit[ ] within the literal language of the statute," Soileua v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997), the Third Circuit has held that making a good-faith request for accommodation is protected activity for purposes of the ADA's anti-retaliation provision. Shellenberger, 318 F.3d at 191.

To make out a *prima facie* case of illegal retaliation under the ADA, a plaintiff must show (1) protected employee activity, (2) adverse action by the employer either after or contemporaneous with the employee's protected activity, and (3) a causal relationship between the protected activity and the adverse action. Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 759 (3d Cir. 2004); Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002). The same McDonnell Douglas burden-shifting framework described above with respect to ADA discrimination claims also applies to ADA retaliation claims. In all cases involving alleged retaliation, a plaintiff must prove that retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect on the outcome of the process. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997). That burden always remains with the plaintiff. Id.

Finally, with respect to a claim of constructive discharge, a plaintiff must show that her "employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Goss v. Exxon Office Sys. Co., 747 F.2d 885, 887 (3d Cir. 1984). The Third Circuit has set forth several objective factors to be considered when reviewing a constructive discharge claim, including: "whether the employer (1) 'threatened [the employee] with discharge' or 'urge[d] or suggest[ed] that she resign or retire,' (2) 'demote[d] her,' (3) 'reduce[d] her pay or benefits,' (4) 'involuntarily transferred [her] to a less

desirable position,' (5) altered her 'job responsibilities,' or (6) gave 'unsatisfactory job evaluations.'" Colwell v. Rite Aid Corp., 602 F.3d 495, 503 (3d Cir. 2010) (quoting Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)).

It is against these well-settled legal benchmarks that we assess Strickler's discrimination claims.

### 2. **Strickler's Claims Fail as a Matter of Law.**

Turning first to Strickler's discrimination and harassment claims, in her pleadings she asserts that she was subjected to harassment by McGuire and, to some extent, Lecas, because of her bipolar disorder.[3] She further claims that when she made HR aware of the harassment, nothing was done to stop it, and ultimately, Strickler was forced to resign because her working conditions were intolerable and negatively affecting her health.

It is undisputed that Strickler's bipolar disorder qualifies as a disability under the ADA. The record also shows that, subjectively, Strickler believed that the alleged harassment she was receiving from McGuire was so severe or pervasive that it created an abusive working environment. Strickler claims that McGuire's management of her created anxiety and nervousness, and that some of her

---

[3] We note that while Strickler also mentions her scoliosis in her amended complaint as part of her discrimination claims, she focuses primarily on the alleged harassment she claims to have received because of her bipolar disorder. Moreover, she admitted her in deposition that she did not inform anyone at Wellspan, including Fortney, Dr. Jones, Elliott, Lecas, or McGuire of her scoliosis. (Doc. 25-3, at 84-88).

complaints about McGuire stemmed from what McGuire wrote on her performance evaluations. She also asserts that McGuire and Lecas both questioned her integrity and embarrassed her. However, even if we could conclude that these instances amounted to severe or pervasive conduct, as we have stated, Strickler fails to show how any of this conduct was related to her disability. To the contrary, Stricker herself conceded many times in her deposition that she did not think McGuire or Lecas were harassing her because of her disability. (See Doc. 25-3, at 89-90; Doc. 25-4, at 6). She further conceded that she did not tell either of these individuals that she suffered from a disability. (See Doc. 25-3, at 73, 84). Accordingly, we find that Strickler's discrimination and harassment claims premised upon the conduct of these supervisors fail as a matter of law.[4]

We further find that Strickler's retaliation claim fails on similar grounds. On this score, it is undisputed that Strickler reported McGuire's conduct to Mary

---

[4] We further find that Strickler has not set forth evidence showing that Wellspan, or any Wellspan employee, regarded her as disabled. See Murphy v. United Parcel Service, Inc., 527 U.S. 516, 521-22 (1999) ("[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities"). Indeed, as we have explained, Strickler concedes that McGuire and Lecas did not know she had bipolar disorder. Moreover, Strickler has not shown that the individuals who did know of her bipolar disorder—Fortney, Jones, and Elliott— took any kind of adverse action against her. See Gavurnik v. Home Properties, L.P., 227 F.Supp.3d 410, 419-20 (E.D. Pa. 2017) ("[T] mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action") (citations and quotations omitted).

Fortney and Dr. Jones, and later to Jason Elliott, and characterized this conduct as harassment. However, it is also undisputed that Strickler never reported that McGuire was harassing her because of her disability. Indeed, Strickler stated that she never informed Fortney, Dr. Jones, or Elliott that she felt she was being harassed because of her disability. (See Doc. 25-3, at 84-86). The failure to describe this alleged harassment as disability based is hardly surprising since, as we have noted above, Strickler stated that she did not believe that McGuire or Lecas were harassing her because of her disability. (See id., at 89-90; Doc. 25-4, at 6).

Further, we cannot conclude that Strickler was constructively terminated in violation of the ADA because of her reports of harassment that she concedes were not disability based. As we have explained, a plaintiff must show that her "employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Goss, 747 F.2d at 887. Here, we have concluded that Strickler did not suffer any conditions of discrimination because of her disability. Further, although Strickler was given mixed performance reviews, there is no evidence in the record to indicate that Strickler was threatened with discharge, that her pay or benefits were reduced, or that her job responsibilities were altered. To the contrary, Strickler received merit-based salary increases in 2015, 2016, and 2017 *after* she reported the alleged harassment to HR in 2015. (See Docs. 25-18, 25-20, 25-22, 20-26). Moreover, Strickler conceded that her job

responsibilities were expanded after she was removed from McGuire's supervision and worked under Adam Hawk, but that she did not believe that it was because of her disability. (Doc. 25-5, at 3). Accordingly, we cannot conclude that Wellspan constructively terminated Strickler by knowingly permitting disability-based discrimination that rendered the workplace so intolerable that Strickler had to resign.

In sum, while Strickler believes that she was subjected to wrongful conduct which caused her stress and negatively affected her health, she has not shown that any action taken against her was taken because of her disability. To the contrary, Strickler's deposition makes it clear that she did not believe these individuals knew of her disability, let alone that they discriminated against her because of it. Accordingly, we find that Strickler's claims under the ADA and PHRA fail as a matter of law, and we will grant the defendant's motion for summary judgment.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the defendant's motion for summary judgment (Doc. 23) will be GRANTED.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: March 27, 2023